**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| GARY STANHOPE | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:24-CV-1342 (JCH) |
| | : | |
| | : | |
| v. | : | |
| | : | |
| LIVE NATION WORLDWIDE, INC. | : | |
| D/B/A XFINITY THEATRE | : | MAY 11, 2026 |
| Defendant. | : | |

**RULING ON MOTION TO PRECLUDE TESTIMONY OF RUSSELL KOLINS (Doc. No. 58)**

**I.      INTRODUCTION**

Defendant Live Nation Worldwide, Inc. d/b/a Xfinity Theatre ("Live Nation") brings

this Motion against Plaintiff Gary Stanhope ("Mr. Stanhope") to preclude the testimony

and reports of Mr. Stanhope's security expert, Russell Kolins ("Mr. Kolins") due to Mr.

Kolins' alleged lack of qualification as an expert for (1) large concert venue security; (2)

the alleged unreliability of Mr. Kolins' analyses; (3) and the claimed lack of "fit" of his

opinions to the facts of the case.  See Motion and Memorandum of Law in Support of

Defendant's Motion to Preclude ("Mot. to Preclude") (Doc. No. 58, 59).  Mr. Stanhope

opposes the Motion.  See Memorandum of Law in Opposition to Defendant's Motion to

Preclude ("Pltf's Opp'n") (Doc. No. 64-1).  Live Nation submitted a Reply in further

support of its own Motion.  See Live Nation's Reply Brief in Further Support of Motion to

Exclude the Testimony of Russell Kolins' ("Def's Reply") (Doc. No. 67).

For the reasons stated below, the court denies Live Nation's Motion to Preclude

(Doc. No. 58).

## II.    BACKGROUND

On July 30, 2022, Mr. Stanhope attended a Luke Bryan concert at the Xfinity Theatre in Hartford, Connecticut with friends.  The group stood on the asphalt walkway in the general admission area, between Sections 500 and 600, behind the railing separating the lawn from the reserved seating. At approximately 10:00 p.m., Mr. Stanhope was assaulted and sustained serious injuries.  See Hartford Police Department Incident Report ("Police Report") (Doc. No. 64-15) at 3.  Mr. Stanhope does not recall the assault.  See Deposition of Gary Stanhope ("Stanhope Dep.") at 51–52 (Doc. No. 59-5). The assault was witnessed by Mark Pennell.  See Deposition of Mark Pennell ("Pennell Dep.") at 38 (Doc. No. 59-12).

Live Nation deployed 132 trained crowd managers for the event: 116 security personnel and sixteen uniformed officers from Hartford Police.  See Deposition of Michael Andrews ("Andrews Dep.") at 44–47, 78 (Doc. No. 59-1).  This spread of security yielded a security-to-patron ratio of approximately 1:164, well exceeding the NFPA Life Safety Code 101 standard of 1:250.  Id. at 78.

Multiple witnesses who attended the concert with Mr. Stanhope testified that they observed security staff, EMTs, and Hartford Police before the incident, but not in the immediate area of the assault.  See Deposition of Heather Kennett ("Kennett Dep.") at 43–47 (Doc. No. 59-10); Deposition of Traci Hershman ("Hershman Dep.") at 47–48 (Doc. No. 59-8); Deposition of David Thibodeau ("Thibodeau Dep.") at 30–31 (Doc. No. 59-9).

Mr. Kolins, Mr. Stanhope's liability expert, issued an initial report on July 12, 2025, and a supplemental report on September 10, 2025, after he was deposed on

September 5, 2025.  <u>See</u> Kolins Initial Report (Doc. No. 59-19); Kolins Supplemental Report (Doc. No. 64-7); Deposition of Russell Kolins ("Kolins Dep.") (Doc. No. 59-14).

Mr. Kolins' relevant experience consists of two venues: a New Jersey bar he owned from 1981 to 1991 with a maximum outdoor concert capacity of 5,000, and an Atlantic City adult entertainment club of roughly 2,500 capacity that he consulted on in the 1990s.  <u>See</u> Kolins Dep. at 30–31 (Doc. No. 59-14).  He acknowledged that fights occurred regularly at the latter venue despite his security plan.  <u>Id</u>.  Since the 1990s, Mr. Kolins has worked solely as a consultant.  <u>Id</u>.

Mr. Kolins opines that Live Nation failed to adequately deploy security, failed to conduct a written risk assessment, and failed to implement adequate security policies and procedures.  <u>See</u> Kolins Initial Report at 4 (Doc. No. 59-19).  His initial report was written before several fact witness depositions were available.  <u>See</u> Kolins Dep. at 4–8 (Doc. No. 59-14).  After reviewing those depositions, Mr. Kolins issued a supplemental report on September 10, 2025, which incorporated the additional testimony, updated his analysis of foreseeability and crowd density, and further articulated the bases for his deployment and documentation opinions.  <u>See</u> Kolins Supp. Report at 1–12 (Doc. No. 64-7).

## III.    LEGAL STANDARD

Expert testimony is admissible under Rule 702 of the Federal Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. Rules of Evid. 702.  The District Court acts as a gatekeeper, charged with the task

of deciding whether the expert's testimony satisfies Rule 702's general requirements.

See Daubert v. Merrell Dow Pharms., 509 U.S. 579, 592-97 (1993).  In defining the

gatekeeping role of the District Court, the Second Circuit has distilled Rule 702's

requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance

and assistance to the trier of fact.  See Nimely v. City of New York, 414 F.3d 381, 396-

97 (2d Cir. 2005).

If an expert meets the threshold requirement of qualification, the court must

determine whether the expert's testimony itself is reliable.  In Daubert, the Supreme

Court identified several factors that may be considered in assessing reliability:

(1) whether a theory or technique "can be (and has been) tested," (2) "whether
the theory or technique has been subjected to peer review and publication," (3) a
technique's "known or potential rate of error," and "the existence and maintenance of
standards controlling the technique's operation" and (4) whether a particular technique
or theory has gained "general acceptance" in the relevant scientific community.

See Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002)

(quoting Daubert, 509 U.S. at 593–94 (internal quotations and citations omitted)).

These factors, however, do not constitute a "definitive checklist or test."  See Kumho

Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999).  Instead, the inquiry is a flexible

one and must be "tied to the facts of a particular case" with attention to "the nature of

the issue, the expert's particular expertise, and the subject of his testimony."  Id.

Further, it bears noting that the Second Circuit has endorsed a broad standard of

admissibility for expert testimony.  See generally Do No Harm v. Pfizer Inc., 126 F.4th

109 (2d Cir. 2025).

4

**IV.    DISCUSSION**

Live Nation seeks to preclude the testimony of Mr. Kolins due to his lack of qualifications, the lack of identifiable methodology, and the lack of fit of his opinions to the facts of the case.  See Mot. to Preclude at 1.  Depositions were ongoing for fact witnesses when the initial report and deposition of Mr. Kolins took place on September 5, 2025; the parties were both aware of a supplemental report to be issued after Mr. Kolins reviewed the ongoing fact witness depositions and the defendant declined to re-notice Mr. Kolins' deposition after the supplemental report was issued.  See Pltf's Opp'n at 1.

A.    Mr. Kolins is Qualified

An expert's credentials do not need to be unassailable in order for their testimony to be admissible.  See TC Systems Inc. v. Town of Colonie, 213 F.Supp. 2d 171, 174-76 (NDNY 2002).  Federal Rule of Evidence 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Mr. Kolins satisfies the requirements.  He possesses years of experience as a security consultant, holds a certification and bachelor's degree in Security Management, and served as leadership at the ASIS International Hospitality, Entertainment, and Tourism Security Council.  See generally Mr. Kolins' CV (Doc. No. 64-3).  Mr. Kolins has been admitted to testify as a security expert in other courts and has spoken on premises security and crowd management.  Id.

Live Nation argues that Mr. Kolins has never managed a 22,000-person venue and thus lacks the necessary qualifications.  See Mot. to Preclude at 13.  However, Mr. Kolins does not need to match the exact subtype of security venue.  See Evers v. Hoffman, No. 25-CV-2423, 2026 WL 555407, at *4 (E.D.N.Y. Feb. 27, 2026) (holding that a general biomechanic degree and education; not only medical training, qualified an expert to testify on general traffic accident injury mechanism and opine on the force sustained in medical injuries); see, also, Sullivan v. Metro-N. Commuter R. Co., 292 Conn. 150, 160-61 (2009) (holding a security expert was qualified to testify on railroad security as the matter at hand was not specific to railroad stations).  Live Nation is free to cross-examine Mr. Kolins on his experience with large venue management at trial and provide its own expert who, in its opinion, is better suited for the facts at hand; however, Mr. Kolins meets the standards for qualification.

B.    Mr. Kolins' Methodology is Reliable

Live Nation argues that Mr. Kolins' expert testimony is not based on an identifiable methodology.  See Mot. to Preclude at 16.  It asserts that Mr. Kolins' report and depositions reveal no identifiable methodology for his conclusions and that he did not review any history of prior incidents, did not review crime data, did not read witness depositions, or conduct a site visit.  Id.

Mr. Stanhope argues that Mr. Kolins' methodology uses authorities in the field and follows the standards of the International Association of Professional Security Consultants (IAPSC).  See Pltf's Opp'n at 12.  Mr. Kolins focused on the deployment of

security personnel and submitted a supplemental report after reviewing the witness depositions which were ongoing during the time of his initial report.[1] Id. at 10, 12.

The Daubert inquiry is fluid and will necessarily vary from case to case and the Supreme Court has identified a number of factors bearing on reliability that district courts may consider, such as: "(1) whether a theory or technique can be and has been tested . . . (2) whether the theory or technique has been subjected to peer review and publication . . . (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation . . . (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. See Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593 (1993). These factors do not constitute a definitive checklist or test but rather an inquiry that is flexible. See Daubert, 509 U.S. at 593.

In his Supplemental Report, Exhibit 5 (Doc. No. 64-7), Mr. Kolins details his methodology and application to the facts of this case. He utilizes authorities such as the American National Standards Institute on Crowd Management and the International Association of Venue Managers. Id. at 2, 3. Mr. Kolins then details how he took the various factors from the methodology and applied them to the facts at hand. Id. Mr. Kolins discusses the foreseeability of crowd density and congestion, as well as alcohol sales. Id. at 3-5. Mr. Kolins analyzes the deployment of security personnel and

---

[1] The Supplemental Report (Doc. No. 64-5; 64-6) was submitted and received by Live Nation, yet Live Nation still argues in its Motion that Mr. Kolins' methodology is flawed because he did not review all the depositions at the time of his own deposition, a fact it already knew, and which is corrected in Mr. Kolins' Supplemental Report. See Pltf's Opp'n at 9.

7

cameras.  Id. at 5-6.  Mr. Kolins discusses the security planning and protective measures utilized by Live Nation.  Id. at 6-7, 10-11.  Finally, he addresses the response of security personnel to crises and incidents.  Id. at 8-9.  In each section, Mr. Kolins references the standards of the security community and analyzes how Live Nation met or did not meet those standards.  A jury can weigh the testimony of Mr. Kolins as well as the defendant's experts, in deciding how to apply the expert report to the other pieces of evidence the jury will hear.  Both the plaintiff and defendant will present experts who draw the jury's focus to different aspects of their reports.  Mr. Kolins, as the plaintiff's expert, will likely draw a jury's attention to his analysis of the deployment of security personnel, while the defendant will likely focus on the staffing numbers.  Mr. Kolins explains his analysis, methodology, and sources meet the standard required for him to testify.

C.     <u>Mr. Kolins' Opinions Fit the Facts of the Case</u>

Live Nation argues that Mr. Kolins' testimony does not fit the facts of the case. <u>See</u> Mot. to Preclude at 28.  Specifically, it argues that Mr. Kolins has no command of the record at his deposition and issued a supplemental report to try to cover any deficiencies.  Id.  Live Nation asserts that the literature cited is dated, and opinions are boilerplate or general.  Id. at 28-29.

Mr. Stanhope argues that Mr. Kolins' testimony is pertinent to the case regarding negligent security.  <u>See</u> Pltf's Opp'n at 13.  He argues that Mr. Kolins brings specific examples of negligent security, insufficient crowd management, lack of cameras, and defendant's obligations.  Id. at 14.

Mr. Kolins offers testimony that is important to the issues of negligence.  First, he provides an overview of the responsibility of venue managers such as Live Nation and

the duties of the facility supervisors regarding security policy and procedures.  See Pltf's

Opp'n at 13-14.  Additionally, Mr. Kolins offers his expert testimony as to the crowd

management plans for concert events speaking on the seating arrangement, crowd

flow, density of concertgoers, and prior incidents at the concert.  Id. at 14.  Finally, Mr.

Kolins offers his opinions as to why the security was inadequate including how no

security appears to have witnessed the assault itself, the lack of video camera

surveillance, and the venue's responsibility to identify and correct those issues.  Id.  Mr.

Kolins provides testimony that fits the facts of the case.  He describes the

responsibilities, standards, and alleged failings of Live Nation in connection with the

assault on Mr. Stanhope.  A jury could credit his expert testimony, and Mr. Kolins is

permitted to testify as to the security standards and alleged breaches of Live Nation.

## V.    CONCLUSION

For the reasons stated above, the court denies Live Nation's Motion to Preclude

(Doc. No. 58).

## SO ORDERED.

Dated at New Haven, Connecticut this 11th day of May 2026.


   /s/ Janet C. Hall
   Janet C. Hall
   United States District Judge

9